Mr. Escamilla, Your Honor, my name is Mr. Iredale. I represent... Oh, you're Iredale. Okay, sorry, I've got it backwards. Okay, Mr. Iredale. May I wish the court a rainless good morning? I represent the estate of Timothy Smith and his son. We ask the court to reverse the grant of summary judgment to the defendant in this case. This case raises the issue of when a bail bondsman becomes liable under 1983 for acting under color of law. We cited the leading circuit court cases. The summary in the Landry v. Able bail bonds case is the statement of the law upon which we rely. And it says that normally a bail bondsman, even though the bondsman is licensed by the state in most states, and even though the bondsman conducts what is typically a public function, specifically the forcible seizure and arrest of citizens, nonetheless remains a private person for purposes of Section 1983 liability unless the bondsman enlists, and that's the language that the case uses and the other cases tend to use a similar formulation. When the bondsman enlists the police to serve his purpose or to effect an arrest, then the bondsman becomes for that purpose a person acting under color of state law. So it seems maybe you could have an argument that the bondsman here enlisted the police to help with an arrest, but the violation here was excessive force for shooting. And I don't see anywhere where these bondsmen asked the police to go shoot him. Judge Freeland, three things. One is I invoke the presumption that a person intends the natural and likely consequences of their acts. But I think this is the problem with your argument because that's the proximate cause theory. Is the causal chain so connected? And I'm not sure it is here because the causal chain seems like it got broken. You don't usually think that someone's going to get shot when they get arrested. Well, and I would agree with you in the abstract. But when the bondsman enlists the aid of the police by fraudulent means, and the fraud involves statements of an inflammatory nature that have as their foreseeable and actual in this case consequence of making much more likely the use of fatal force and of putting in the minds of the police who use that fatal force the belief that this person was armed and dangerous, then it is reasonably foreseeable that the police will be in a position where... Let me go to the specifics, if I might, in answering the question. In other words, I take your question. My answer to your question is one, a person intends the natural and probable consequences of their acts. Two, you must look to the issue of reasonable foreseeability. And three, if the nature of the bondsman conduct in enlisting the police to effect the arrest, to do his work for him, to stand in and do his cause, is such that it will greatly increase the likelihood of the use of excessive or fatal force, then the bondsman then properly becomes liable for the improper use of that fatal force. Specifically, this bondsman and his confederate, Soto, told the police things that were not true. One, this defendant is armed with an AK-47 in his backpack. Two, yes, Judge Sum. And we've read the facts, and they're tragic, and I'm sorry for your client's loss. The problem here I have is if a regular private citizen makes essentially a false or inflammatory report to the police, I don't think that normally is in and of itself enough to bring them under, cause them to be acting under color of state law to be liable under Section 1983. So there has to be something different. And then we have our prior case law in Utes that basically says bail bondsmen are private actors, and when they're not actually acting under the authority that has been granted to them by the state, they're not acting under color of state law. We have here essentially a record where the bondsman was assisting essentially an out-of-state bondsman, and none of the things that were normally required for them to effectuate an out-of-state bond were done. And I understand your contention is that that brings this case into 1983, but what I have a hard time with is that it seems that under Utes, I'm not sure I'm pronouncing that correctly, but that actually takes them outside. They're not acting under color of state law. Let me, if I could, address the points that you made, Judge Sum. One, that is correct. The law is that a complaint to the police normally does not make the person a state actor. And that's true, by the way, in the state of California, even if the complaint is made maliciously and falsely for the specific purpose of hurting someone, which is why in this case our remedy is 1983 or nothing. Under the Hagberg case in the state of California, I could call up somebody and say, oh, by the way, my neighbor is shooting his wife, and the police then, the SWAT team comes, and they think that some ambiguous action is fatal force, and they use fatal force and kill somebody. Well, I could be criminally liable for a false police report, but there's no civil recompense. And also, that's the precise example I wanted, and it came to my mind, Judge Friedland, in response to your question. And that is, in this case, what we say happened was essentially the same as happens with SWATing. I call up and I say, this person next door to me has an AK-47. He's dangerous. He's looking at a life sentence. Oh, by the way, he's a child molester and an armed robber. He has a long history of criminal conduct, of violence, and it's going on right now, and I need your help. Please go to arrest him. And when the police come, the person that they are looking at, who in fact is none of those things, puts his hands in his pockets, or moves in a certain way, or has a cell phone in his hand, and it's dark. And the police blast him. Now, how can you blame the police with absolute soul blame in that situation when they have been given information which is false, and they want to live. They want to go home that night. And what we say is, no, in that circumstance, the person who gave that false information is responsible for the natural, likely, foreseeable consequences of that act. And now, Judge Sung, let me, if I could, just go back. Can I just clarify what you said? So there's no intentional tort under California law for this conduct? There, with two exceptions, yes. The case is Hagberg, H-A-G-B-E-R-G. It's a California Supreme Court case. And what it says is that under Section 47 of the Civil Code, there's the litigation privilege. And since the beginning of criminal litigation is a report to the police, it's absolutely privileged. Now, there are two statutes concerning false allegations of child abuse, and I think of elder abuse, that allow civil liability. But save for that, nothing. So I could call up and say, my neighbor just did X, Y, and Z. And I know it's absolutely false. I'm doing it maliciously. And for the very purpose of causing harm, now, if the police or the DA chooses, they can charge me with a violation. I think it's Penal Code 148.5, false statement to the police. But if my neighbor wants civil recompense, out of luck. That's absolutely privileged under the Hagberg case. Let me go back, Judge Sung. You do raise a point. Which is, what do you do with the 847.5 of the Penal Code, where the out-of-state bondsman has to go to court, or the bondsman seeking to arrest an out-of-state fugitive has to go to court, in order to the bondsman himself do that? And the answer is, basically, the law is saying, if you do this, you're a private actor. The court authorizes you to do so. But if you don't, and you enlist the aid or assistance of the police, in order to avoid doing that step, I believe you are also a state actor. Although, I appreciate the paradox that you have put your finger on. And I think it's there. But I don't know that it cuts against us. I do agree that it's a curious thing, and the way it cuts in this case. Because in the Oobst case, what Judge Trask, and by the way, I think Judge Huffstetler's dissent has the better of the argument, but that's my own prejudice. Judge Trask, though, says, in this case, the reason why there's no state action, no color of law, no 1983 for the bondsman, the reason is that these bondsmen acted purely on their own, and in violation of the law. Well, isn't that the case here? Because Mr. Escamilla didn't do what a bondsman was required to do in this situation, coming from out of state into California. No, because he did have his alternative. And he did the alternative. What he did was illegal, because it was fraudulent and false. But there's nothing wrong, in other words, under Oobst and under 847.5, so long as he doesn't grab the out-of-state person in the absence of that application to a California Superior Court for an order permitting it. He delegates it. He enlists the police to do it. So the enlistment of the police, as such, in the abstract, is not at all illegal. That's appropriate. If the police choose to make the arrest, that's fine. The bondsman gets them to do his work. In this case, what is wrong, what we say gives rise to liability, is the constant use of the police and lying to the police, who themselves, to a certain extent, were the victims of the case. I'd like to reserve 2 minutes and 20 seconds, if I might. You may. Good morning. If it pleases the Court, I'm Dan Escamilla, defendant in this action. The first thing I would like to point out is that I don't want my actions conflated with those of Ismael Soto. I never made any of the inflammatory allegations concerning child molestation, life sentence, things like that. The record is clear on that, and the judge's order is also clear on that. When he goes over on page 30 of his order, the fact that my only involvement was being the case agent that was referred the case from the Missouri bondsman and from a colleague, Leland Chapman, who is the son of Dog the Bounty Hunter, who was handling the case before me in Missouri, I received the case, I received it with a wanted poster that said armed and extremely dangerous. When I inquired about that language, they told me that he had a roommate named Tiffany Moore, who the police later interviewed and confirmed, truthfully stated that he had two firearms. One was an AK-47, one was a revolver. So I truthfully placed that in the wanted poster, saying CI reports that one of the parties, there were two parties here, was in possession of these firearms. I didn't make any false statements to the police. There's no record of that, and the judge's order confirms that. The evidence supports the district court's ruling that armed and dangerous information was truthful and accurate. As much as Plaintiff's attorney would like you to believe that I concocted facts to enlist in the aid of the police to catch a fugitive that I had been assigned, there's nothing in the facts which support any allegation of nefarious conduct or fraudulent conduct, as he calls it, on my part. The officer's safety information that I conveyed to the San Diego police officers was something that I believe I have an ethical duty to give to the officers. If I receive credible information that a fugitive that I'm chasing in their area, in addition to complying with the statutory requirement letting them know that I'm operating in their area, I believe I also have a duty to notify them of significant risks to officer's safety that might be involved in a fugitive that I'm chasing. So you're making arguments that make it like I didn't really do anything wrong or you shouldn't be mad at me, like these weren't false and I had an ethical obligation. But I'm not sure if they really go to whether there's proximate cause here, like whether or not it's true that you thought he had a gun, saying to the police he had a gun is going to increase the chance of him getting shot. And I think we've got to figure out if there's proximate cause. Whether it's true or not may not really relate to whether there's proximate cause. Well, let me talk to you about the facts of the case. The police officer, recognizing the picture that I had given them the day before, recognized the fugitive coming out of a 7-Eleven. When he went to get out of his car to approach him, the fugitive ran. You need to be clear, he's not actually the fugitive though, right? Well, okay, he's not the fugitive that I was hired to arrest. I was hired to arrest the girlfriend. But since he was traveling with the girlfriend, and because he posed such a significant public safety risk, we included his information on the wanted posters. And he did also, according to the order, have several out-of-state warrants for his arrest as well. So he was also a fugitive. And he wasn't my assigned fugitive, but, yes, he was also a fugitive. When he ran, they set up a perimeter. They brought in the police dog. The police dog flushed him out of a phone closet in an alley. He ran, jumped up on a fence. The police dog grabbed his shoe, kept his shoe, and the fugitive continued to run. And he was standing on a roof at the time that the police confronted him and shot him. Now, when Mr. Iredale argues the natural and probable consequences of one's act, I think it's reasonable to show that the acts of the fugitive in running from the police, in evading the police dog, and in trying to get away, those, you know, break off any chain of causation, you know. This, I mean, Paul's graph tells us that. Well, it's certainly the but-for cause. I'm sorry? It's certainly the but-for cause. Well, the subsequent. I have less problem with the proximate cause. I mean, I think it's definitely a contributory cause. But I have more concern regarding the acting under colors of state law argument. And I'm wondering what's your best argument that you were not acting under color of state law. The cases that define color of state law require a joint enterprise with the police. They require a private party going shoulder to shoulder with the police. And there have been cases where, you know, in Riverside or San Bernardino County, in the middle of nowhere, officers will ask us to come with them when they execute a search warrant for a fugitive that we have. And in that situation, I would certainly be a state actor because I'm in a joint enterprise with the police. But here, my actions in simply referring the police officer safety information and giving them the flyer with the picture on it, those are something that any responsible citizen should do. And if the court finds that that's state action, then they would chill the general public's what I believe is a civic duty of protecting police officers by letting them know of dangerous activity or potential for harm that exists in a certain case. And there certainly was potential for harm here because he certainly was at one point in possession of two firearms, and he was definitely dangerous. The dangerous part was talked about in the court's order. He tried to run over a fugitive recovery agent in Texas, and that was brought out through the deposition of the bail agent that referred me the case. One thing that, I mean, separates you from the normal citizen, right, is that you have talked about how you were asked to help recover this fugitive, right? And so that's not normally why a private citizen calls the police, right? So, I mean, but you're saying even, I mean, how do, there is a little bit of a difference, I guess, between your role, right, as a, you know, and were you actually trying to recover this fugitive when you reported it? Not the one that was shot. Right, okay, but if, and if you were, why doesn't that make you acting under color of state law? Well, first of all, until April 1st of this year, fugitive recovery agents were not licensed in the state of California. Now they are, and Mr. Iredale might be interested in this, we're required to carry $1 million insurance policies. But before April 1st of this year, we were simply required to hold onto a certificate showing that we had completed several classes. So the conduct which fugitive recovery agents engage in is private. OUTS makes it very, very clear that we're not acting on a warrant. We're acting on the bail bond. We have authority by virtue of the bail bond. We don't have authority by virtue of the warrant. Does that answer your question? There was no reasonable basis, either factually or legally, for a plaintiff's attorney in this case to accuse me of the death of Timothy, I'm sorry, of Eugene Smith. Yes, Timothy Gene Smith. Despite being accused in some type of improper conduct, which led to the preventable death of the defendant in this case, I think that disseminating true and accurate information, which the trial court found, is not something that should lead to any type of liability, especially since a liability is predicated on the Fourth Amendment violation of excessive force. As noted by Judge Friedland, we did not ask the police to use deadly force. We avoided whenever possible. I mean, obviously it's a liability issue, and nobody wants anybody to die. They were once our client. They walked into our office, our bail office, and we trusted them enough to bail them out. And we usually have friendly, amicable relationships with the people that we bail out. This isn't something where we planned on having the decedent come across any type of harm at all. We never want that. And there's certainly, by just telling the police, look, there's a problem. There's a guy in this area. We've been told that he's carrying guns. He's got warrants out. He's traveling with another fugitive who also has her own gun. There's two guns involved in this case, and we think you should know about it. So there was nothing irregular about that. And also I should point out that it is a violation of California state law. If you're a fugitive from another state to set foot in the state of California, that automatically is a violation of Penal Code Section 1551.1, I believe it is. And in those cases, we do turn the person over to the police. We make a citizen's arrest and turn the person over to the police for that violation. So that's how sometimes we're able to get around the 847.5 section that counsel noted. And if the warrant is extraditable, which this one was, then the police will arrest the person and they will be extradited to their home state. So there's nothing irregular about that. That happens all the time. Any questions? I'll reserve the rest of my time, if I may. No, this is it. Oh, this is it? Okay. I think the last point that I just want to make is the cases talk about there being no rigid formula for measuring state action for purposes of Section 1983 liability. And I'm quoting from Outs, which cites the Burton v. Wilmington case, a U.S. Supreme Court case. The process is sifting facts and circumstances, which is the language of the case, which must lead us to the correct determination. And I think here that if you sift the facts and circumstances, that my conduct, I acted as any reasonable person would, as any reasonable fugitive recovery agent would, and I let the police know of a potential danger. I wasn't inflammatory in letting them know about it. I should not. The actions of Ismael Soto, who was an unserved defendant in this case, who Mr. Iredale chose not to go after for whatever reasons, should not be conflated with the actions that I committed in this case, which were simply creating the wanted poster based on true and accurate information and handing it to the police. Now, I think there's a definite problem attributing any proximate cause between that and the officer's decision to use deadly force in this case. And I think the officer's own testimony articulates that he did not know about any of the other facts. He simply viewed somebody who had a thousand-mile stare in his eye and who was pulling something out of his pocket after fleeing a police dog and getting away from a police dog, and he was 100% convinced that that person was going to use deadly force on him. I don't think his decision to shoot, and his testimony bears this out, had absolutely anything at all to do with the information that Soto, who was independently hired by the bail agent, by the way, that Soto gave to the dispatcher. I agree that it was inflammatory. I don't want to say anything more about that, but that was between Soto and the police dispatcher. I did not know about any of that language until after the lawsuit was filed, by the way. But I just think that my actions are not culpable here in the least. And I would go so far as to say that Mr. Iredale's lawsuit against me is frivolous. I have nothing more. Thank you. All right. Thank you, counsel. Mr. Escamilla has essentially given you a 15-minute recitation of facts that are either clearly false or that were not considered by the judge in his ruling. They're certainly not the facts in the light most favorable to the non-moving party. With respect to what he just told you, he said, I never recruited Soto. Soto did what he said. What Soto said, I had no knowledge of. We have the deposition in the record of Ismael Soto. I'd ask the court to review that. Soto says that this man went to his house, had already worked with him on five to ten other cases, recruited him to work in this case, and that everything that Soto said to the police, he got from Escamilla. In the record, volume two of the excerpt of record, I need to refer the court to pages 308, 309, and 310. Mr. Escamilla just conceded that the statements made were inflammatory, and I took that as being a concession that they would be likely to create harm. Here is Mr. Escamilla speaking on the 4th of November 2015 to Detective Collier, the detective who was investigating the homicide which had just occurred. Escamilla says, You know that you guys had every reason to believe that you were dealing with a long-time career criminal that has everything from child molestation to armed robbery on his record. You will see in the record on pages 174 to 181 what Mr. Escamilla had been given by Macy, the bondsman who was out of state from Missouri, who hired him. That shows a regrettably prolific criminal record, none of which was violent, save for something called use of a weapon that had occurred 25 years before he was shot dead by the officer, who, by the way, at his deposition testified that what he had in his mind was the information he received over the radio that the guy was 1035, armed and dangerous. We also submitted to the court the video of the actual shooting, and you can see the overreaction of the officers who are clearly frightened by the information that they have received. Mr. Escamilla says that the court made a finding that he only gave truthful information. That's false. The judge's decision assumed the falsity of the information, but then we say made an erroneous conclusion of law that there was no state action. There's one other thing I need to say, and that is that in this case, Mr. Escamilla, according to the testimony of Soto in his deposition, uses this as his pattern. He will use statements to the police to get them to be involved in going after someone. In this case, Janie Sanders, the fugitive, was a fugitive on a $7,500 bond for simple drug possession in Missouri, but he knew he was with Mr. Smith, so he exaggerated Mr. Smith's record. He lied about it, in fact, repeatedly. Had Soto lie and then himself repeats the lies, as I have cited in the record, and he did that because he knew if he could interest the police in going after Mr. Smith, Janie Sanders would be with him, he would get his payment for apprehending the fugitive, and all would be well. In that regard... Can I just ask one question because you're over your time? Of course. Is there a distinction in what you have to prove between the conspiracy to violate Section 1983 count and the direct violation of Section 1983? I need to take just a moment, if I could, to answer that because I think the district court judge misunderstood what we were saying. He thought we were alleging a conspiracy between Escamilla and the police, and we weren't. Escamilla lied to the police. There was no meeting of the minds there. He used the police, having enlisted them through the lies. What we were saying is Escamilla, Soto, and others themselves conspired to perpetrate this lie with the likely effect that there would be excessive force used if the police believed that Mr. Smith had a long record of violent crimes, was a felon who was currently armed with an AK-47, and who was looking at a life sentence in prison, all of which were false. And so in that regard, technically, yes, there would be a difference in proof as an abstract. That is to say, the conspiracy is the agreement to do the violation, the agreement to tell a lie, and the actual lying is the 1983 offense that we allege in the case. I hope that answers the question, Judge Warlock. Does anybody else have any questions? Okay, thank you, Counsel. Thank you so much. The State of Timothy Gene Smith v. Escamilla will be submitted, and this session of the court is adjourned for today. Thank you, Counsel. All rise. This court for this session stands adjourned.
judges: WARDLAW, FRIEDLAND, SUNG